UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                        :

IPSOS-INSIGHT, LLC,                      :

                        :

            Plaintiff,          :

                        :          21-CV-3992 (JMF)

        -v-                 :

                        :       OPINION AND ORDER

JACOB GESSEL,                  :

                        :

            Defendant.     :

                        :

------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       This case appears to present an issue of first impression: whether, under New York law, a

non-compete agreement between a company and one of its in-house lawyers that restricts the

lawyer's ability to work post-employment is *per se* unenforceable. Plaintiff Ipsos-Insight, LLC

("Ipsos") seeks to enforce such an agreement against a former in-house lawyer, Jacob Gessel,

who now works for a competitor of Ipsos. Gessel, however, moves to dismiss, arguing that his

non-compete agreement with Ipsos is *per se* unenforceable under New York law because it runs

afoul of Rule 5.6(a) of the New York Rules of Professional Conduct, which provides that "[a]

lawyer shall not participate in offering or making . . . a partnership, shareholder, operating,

employment, or other similar type of agreement that restricts the right of a lawyer to practice

after termination of the relationship, except an agreement concerning benefits upon retirement."

N.Y. RULES OF PRO. CONDUCT r. 5.6(a) (N.Y. State Bar Ass'n 2020).

       Were the Court writing on a blank slate, it would almost certainly reject Gessel's

argument. Having voluntarily entered the non-compete agreement with Ipsos, Gessel should not

now be able to walk away from it. And because non-compete agreements are (assuming they

meet certain requirements) enforceable under New York law against members of *other* learned

professions, such as doctors and certified public accountants, there is little justification for treating lawyers differently. But the New York Court of Appeals has treated lawyers differently, holding that non-compete agreements between lawyers and law firms are unenforceable in light of Rule 5.6(a) (or its precursor), and this Court is bound by those decisions. As discussed below, the Court is therefore compelled to grant Gessel's motion to the extent that Ipsos's claim is premised on Gessel's alleged violation of his non-compete agreement.

## BACKGROUND

The following facts — which are drawn from the Complaint ("Complaint"), ECF No. 1 ("Compl."), and documents incorporated by reference therein — are assumed to be true for purposes of this motion. *See, e.g.*, *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110-11 (2d Cir. 2010). Ipsos is an international, survey-based market research company. Compl. ¶ 8. Gessel began working in Ipsos's Public Affairs department around February 2013. *Id.* ¶ 9. He subsequently graduated from law school, passed the bar exam, and accepted a job in Ipsos's legal department in or around February 2017. *Id.* ¶ 10. Gessel was later promoted to Assistant General Counsel for Ipsos North America. *Id.* ¶ 11.

At all times during his employment, Gessel was subject to a Fair Competition Agreement containing a paid non-compete clause ("Non-Compete Clause"), which he was required to sign as a condition of his employment. *Id.* ¶¶ 11-13 & n.1; *see also* ECF No. 12-1 ("Fair Competition Agreement"). The operative version of the Non-Compete Clause states:

> [Y]ou agree . . . that during your employment with [Ipsos], and for a period of twelve (12) months after the date of termination of your employment for any reason (the "Non-Compete Period"), you will not directly or indirectly work for or with, own, invest in, render any services or provide advice to, or act as officer, director, employee, or independent contractor for, any person or entity that competes with [Ipsos] in the products or services it offers to its Clients at the time of the termination of your employment. You acknowledge that given the nature of the business of [Ipsos] and the geographical market of [Ipsos] (which you

acknowledge is international in scope) combined with your role and responsibilities, the geographical area of the United States and Canada and the period of twelve (12) months are both reasonable.

Compl. ¶ 13 (emphasis omitted); Fair Competition Agreement § 5(b).

If Gessel resigned from Ipsos (or was terminated without cause), the Non-Compete Clause took effect only if and to the extent that Ipsos elected to exercise it and, in exchange, paid Gessel his base salary for a period of up to twelve months. Compl. ¶ 13; Fair Competition Agreement § 5(d). To that end, Gessel was required to provide at least two weeks' written notice before accepting employment with "any business which in any way touches on, is related to, or competes with the business of [Ipsos]." Compl. ¶ 13; Fair Competition Agreement § 5(e). Under a separate employment contract, Gessel was required to give at least forty-five days' written notice before resigning from Ipsos, regardless of whether he intended to work for an arguable competitor. Compl. ¶ 19; ECF No. 12-2, § 7. The Fair Competition Agreement also required Gessel to "promptly return" any company property in his possession or control when his employment ended and to "provide access (including passwords and any codes) to any computer or other equipment (electronic or otherwise)" containing information relating to Ipsos that was in Gessel's possession or control when his employment ended. Fair Competition Agreement §§ 2(a), (b); *see* Compl. ¶ 16. The Fair Competition Agreement contains a New York choice-of-law clause. Compl. ¶ 7; Fair Competition Agreement § 9(h).

On March 4, 2021, Gessel informed his supervisor that he intended to resign from Ipsos. Compl. ¶ 20. He sent a formal notice of resignation the following day. *Id.* On April 13, 2021, Gessel disclosed that he had accepted a job with Medallia, Inc. ("Medallia"), a "direct competitor" of Ipsos. *Id.* ¶¶ 1, 23, 25. On April 16, 2021 — Gessel's last day at Ipsos — the company sent him a letter informing him that it had decided to exercise the Non-Compete Clause for its maximum duration of twelve months. *See id.* ¶¶ 25-26. Gessel responded that he "d[id]

not agree to the non-compete requirement and as such should not be paid." *Id.* ¶ 28. On April 29, 2021, Gessel announced on the social media platform LinkedIn that he was starting a new position as Corporate Counsel at Medallia. *Id.* ¶ 31. Separate and apart from the foregoing, Ipsos alleges that Gessel "deleted all of the information from the cellphone Ipsos provided to him prior to returning it to Ipsos at the end of his employment, violating [S]ections 2(a) and 2(b) of the Fair Competition Agreement." *Id.* ¶ 40.

On May 4, 2021, Ipsos filed this action against Gessel for breach of the Fair Competition Agreement. *See id.* ¶¶ 42-47. The Complaint alleges that Gessel breached the Fair Competition Agreement "by failing to give Ipsos two weeks' advance written notice of his intention to work for Medallia, a competitor of Ipsos"; "by starting employment with Medallia, a competitor of Ipsos, and/or by announcing his intent to do so"; and "by deleting the contents of the cellphone Ipsos provided to him prior to returning it to Ipsos." *Id.* ¶¶ 44-46. Gessel now moves, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Complaint on the ground that non-compete clauses are *per se* unenforceable against attorneys, including in-house counsel, under New York law. ECF No. 10; *see* ECF No. 11 ("Def.'s Mem."), at 7-12.

## LEGAL STANDARDS

In evaluating Gessel's motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all facts set forth in the Complaint as true and draw all reasonable inferences in Ipsos's favor. *See, e.g.*, *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). A claim will survive a Rule 12(b)(6) motion, however, only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). A plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555. If the plaintiff's pleadings "have not nudged [its] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

## DISCUSSION

As noted, Rule 5.6(a) of the New York Rules of Professional Responsibility provides that "[a] lawyer shall not participate in offering or making . . . a partnership, shareholder, operating, employment, or other similar type of agreement that restricts the right of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement." N.Y. RULES OF PRO. CONDUCT r. 5.6(a). By agreeing to the Non-Compete Clause with Ipsos, Gessel violated the plain terms of the Rule. So too did any other lawyer at (or representing) Ipsos who "participate[d]" in drafting the agreement or offering it to Gessel. Any doubt on that score is resolved by consideration of the ethics opinions of the New York State Bar Association Committee on Professional Ethics and its counterparts in other states. The former has opined that Rule 5.6(a) prohibits even lawyers serving in entirely non-legal roles — and, by implication, in-house lawyers — from entering into employment agreements containing non-compete clauses that could be read to restrict the employee's right to practice law in the future, because "the unambiguous language of Rule 5.6(a)(1), and the purposes it promotes, supply no basis to distinguish between a contract with a non-client employer (or any other party) restricting a lawyer's right to practice law after the relationship ended." N.Y. State Bar Ass'n Comm. on Pro. Ethics, Op. 1151 ¶ 6 (2018). And the American Bar Association ("ABA") and other state ethics committees have opined similarly with respect to analogues of Rule 5.6(a). *See, e.g.*, N.J.

Advisory Comm. on Pro. Ethics, Op. 708 (2006); Wash. State Bar Ass'n Comm. on Pro. Ethics, Advisory Op. 2100 (2005); Conn. Bar Ass'n Comm. on Pro. Ethics, Informal Op. 02-05 (2002); S.C. Bar Ethics Advisory Comm., Ethics Advisory Op. 00-11 (2000); D.C. Bar Legal Ethics Comm., Ethics Op. 291 (1999); Phila. Bar Ass'n Pro. Guidance Comm., Op. 96-5 (1996); Va. State Bar Standing Comm. on Legal Ethics, Legal Ethics Op. 1615 (1995); ABA Comm. on Ethics & Pro. Resp., Formal Op. 94-381 (1994).

It follows that Gessel and any other lawyer at (or representing) Ipsos who participated in drafting the agreement or offering it to Gessel could be subject to discipline as members of the New York bar. The question presented here, however, is whether, given these violations of Rule 5.6(a), the agreement is unenforceable by Ipsos under New York law. Put differently, the question is whether a non-compete agreement between a company and one of its in-house lawyers is categorically unenforceable under New York law. In answering that question, of course, the Court is bound by the decisions of New York's highest court, the New York Court of Appeals. *See, e.g.*, *Donohue v. Cuomo*, 980 F.3d 53, 65 (2d Cir. 2020) ("Federal courts, when applying state law, are bound to apply the law as established by the state's highest court."). To the extent that the New York Court of Appeals has not ruled on the question, the Court's task is to "predict how" the Court of Appeals "would resolve" the question. *Runner v. N.Y. Stock Exch., Inc.*, 568 F.3d 383, 386 (2d Cir. 2009) (internal quotation marks omitted); *see also, e.g.*, *Cont'l Cas. Co. v. JBS Const. Mgmt., Inc.*, No. 09-CV-6697 (JSR), 2010 WL 2834898, at *3 (S.D.N.Y. July 1, 2010) (noting that where the highest court has not ruled on an issue, a federal court applying New York law must "carefully review available resources to predict how the New York Court of Appeals would resolve the questions at bar" (internal quotation marks omitted)).

The New York Court of Appeals has not addressed the precise question presented here. But it has twice ruled that an agreement between a lawyer and law firm that violates Rule 5.6(a) or its precursor is unenforceable as a matter of public policy. First, in *Cohen v. Lord, Day & Lord*, 550 N.E.2d 410 (N.Y. 1989), the court considered the enforceability of a forfeiture-for-competition provision in a law firm partnership agreement, which conditioned a withdrawing partner's receipt of earned-but-uncollected fees on his agreement not to practice law in any state where the law firm maintained an office or in any neighboring state. *Id.* at 410-411. The court acknowledged that the forfeiture-for-competition provision did not entirely preclude the withdrawing partner from practicing law in competition with the firm, but merely created a financial disincentive. *Id.* at 411. Nevertheless, the court held that the disincentive constituted an "impermissible restriction on the practice of law" within the meaning of New York Disciplinary Rule 2-108(A) (the precursor to Rule 5.6(a)). *Id.* at 411.[1] The court then traced the history and purpose of the Rule. It explained that its "purpose" is "to ensure that the public has the choice of counsel," and it quoted approvingly from a pair of state and national bar association ethics opinions that set forth the policy later codified in the Rule. *Cohen*, 550 N.E.2d at 411. Those opinions reasoned: "Clients are not merchandise. Lawyers are not tradesmen. They have nothing to sell but personal service. An attempt, therefore, to barter in clients, would appear to be inconsistent with the best concepts of our professional status." *Id.* (quoting ABA Comm. on Pro. Ethics, Formal Op. 300 (1961) (hereinafter "ABA Formal Opinion 300" or "ABA Formal Op. 300")) (quoting N.Y. Cnty. Laws.' Ass'n, Comm. on Pro. Ethics, Op. 109 (1943))). Because

---

[1] On April 1, 2009, the New York Disciplinary Rules, which were based on the ABA's Model Code of Professional Responsibility, were repealed and replaced by the New York Rules of Professional Conduct, which are based in turn on the ABA's Model Rules of Professional Conduct. *See* N.Y. RULES OF PRO. CONDUCT, pmbl.; Steven C. Krane & David A. Lewis, *In with the Rules, Out with the Code*, 81 N.Y. STATE BAR J., June 2009, at 24, 24.

the forfeiture-for-competition provision at issue violated Disciplinary Rule 2-108(A), the court

held, the clause was "unenforceable in [the] circumstances [of the case] as against public policy."

*Id.* at 410.

Several years later, the New York Court of Appeals reaffirmed the proposition that

agreements that violate Disciplinary Rule 2-108(A) (now Rule 5.6(a)) are unenforceable on

public policy grounds.  In *Denburg v. Parker Chapin Flattau & Klimpl*, 624 N.E.2d 995 (N.Y.

1993), the court considered a provision of a law firm partnership agreement that imposed a

financial obligation on withdrawing partners who continued to practice law in the private sector,

the amount of which depended in part on whether and to what extent the withdrawing partner

represented former clients of the firm.  *Id.* at 997.  The Court of Appeals characterized *Cohen* as

holding that Disciplinary Rule 2-108(A) "reflects public policy, rendering certain

anticompetition clauses void and unenforceable."  *Id.* at 998.  "[R]estrictions on the practice of

law," the court reasoned, "which include 'financial disincentives' against competition as well as

outright prohibitions, are objectionable primarily because they interfere with the client's choice

of counsel."  *Id.*  The court added that, in determining whether a contractual clause restricts a

lawyer's right to practice and is therefore unenforceable, the "focus should essentially be not on

the intent of the clause but on its effect."  *Id.* at 999.[2]  Because the effect of the clause at issue in

---

[2]     Notably, while the policy analysis in *Cohen* rested, at least in part, on the State's interest
in ensuring that *existing* clients could follow their counsel to a new law firm, the Court of
Appeals articulated a broader vision of client choice in *Denburg*.  *Compare Cohen*, 550 N.E.2d
at 411 ("The forfeiture-for-competition provision would functionally and realistically discourage
and foreclose a withdrawing partner from serving clients *who might wish to continue to be
represented* by the withdrawing lawyer and would thus interfere with the client's choice of
counsel." (emphasis added)), *with Denburg*, 624 N.E.2d at 998-99 ("[A] clause that penalizes a
competing attorney by requiring forfeiture of income could functionally and realistically
discourage a withdrawing partner from serving clients *who might wish to be represented* by that
lawyer." (internal quotation marks omitted and emphasis added)).

*Denburg* was "to improperly deter competition and thus impinge upon clients' choice of counsel," it was "facially invalid" and "unenforceable as against public policy." 624 N.E.2d at 999-1000.

Since *Cohen* and *Denburg*, the Court of Appeals has twice reaffirmed the holdings of these cases. First, in *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220 (N.Y. 1999), the court stated that "[l]aw firm partnership agreements represent an exception to the liberality with which [the court has] previously treated restraints on competition in the learned professions." *Id.* at 1223 n.1. It characterized *Cohen* and *Denburg* as resting not "on application of the common-law rule" that governs non-compete clauses in other professions, but rather "upon enforcement of the public policy reflected in [Disciplinary Rule] 2-108(A)." *Id.* More recently, in *Geron v. Seyfarth Shaw LP* (*In re Thelen LLP*), 20 N.E.3d 264 (N.Y. 2014), the Court of Appeals relied in another context on "New York's strong public policy encouraging client choice and, concomitantly, attorney mobility," citing *Cohen* and *Denburg*. *Thelen*, 20 N.E.3d at 273-74.[3]

In the absence of these cases, the Court would almost certainly reject Gessel's argument that the Non-Compete Clause is categorically unenforceable. For starters, in the absence of a *per se* rule of unenforceability, such agreements would still be subject to challenge under the reasonableness inquiry that governs non-compete agreements in other professions. *See* ECF No. 21 (Pl.'s Opp'n"), at 22-25. Except as applied to lawyers, non-compete clauses in employment

---

[3] Most other states, like New York, treat non-compete agreements against lawyers as categorically unenforceable. *See* 6 WILLISTON ON CONTRACTS § 13:7 (4th ed. 2004) (citing cases). The New Jersey Supreme Court's decision in *Jacob v. Norris, McLaughlin & Marcus*, 607 A.2d 142 (N.J. 1992), is a leading case that adopted that holding. *See* ROY D. SIMON, SIMON'S NEW YORK RULES OF PROFESSIONAL CONDUCT ANNOTATED § 5.6:4 (2019 ed.). But at least two states, Arizona and California, have declined to adopt the categorical approach. *See Fearnow v. Ridenour, Swenson, Cleere & Evans, P.C.*, 138 P.3d 723, 730 (Ariz. 2006) (en banc); *Howard v. Babcock*, 863 P.2d 150, 157 (Cal. 1993).

contracts are generally enforceable under New York law "to the extent that [they are] reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." *Jefferies LLC v. Gegenheimer*, 849 F. App'x 16, 18(2d Cir. 2021) (summary order) (quoting *BDO Seidman*, 712 N.E.2d at 1223); *see also Morris v. Schroder Cap. Mgmt. Int'l*, 481 F.3d 86, 88 (2d Cir. 2007) (per curiam) ("Under New York law, non-compete clauses in employment contracts are disfavored and will only be enforced to the extent reasonable and necessary to protect valid business interests."). Thus, even without a categorical approach, courts could enforce New York's "strong public policy encouraging client choice and, concomitantly, attorney mobility," *Thelen*, 20 N.E.3d at 273, by assessing whether a particular non-compete agreement would cause "harm[] to the general public" or an "unreasonabl[e] burden[] [on] the employee," *Jefferies*, 849 F. App'x at 18; *cf.* Stephen Gillers, *Some Problems with Model Rule 5.6(a)*, 2007 PRO. LAW. 65, 69 (proposing that a "sensible" alternative to Rule 5.6(a) "could, for example, contain a prohibition against 'unreasonably restricting' a departing lawyer's practice as a condition of payout" following his or her departure from a firm).

A *per se* rule against non-compete clauses for lawyers is all the more difficult to defend given that, under New York law, such clauses may be enforced — subject to the reasonableness analysis set forth above — against other professionals who hold positions of public trust and owe special ethical duties to their clients, such as physicians and certified public accountants. *See, e.g.*, *BDO Seidman*, 712 N.E.2d at 1222, 1226-27 (partially enforcing a non-compete clause in a certified public accountant's employment agreement); *Gelder Med. Grp. v. Webber*, 363 N.E.2d 573, 575 (N.Y. 1977) (enforcing a clause in a physician's employment agreement that prohibited him from competing within a radius of thirty miles of his former partnership for a five-year

period after his expulsion); *Karpinski v. Ingrasci*, 268 N.E.2d 751, 753 (N.Y. 1971)

("[C]ovenants [not to compete] by physicians are, if reasonable in scope, generally given effect."

(citing cases)). As out-of-state courts and commentators have articulated, it is difficult to discern

a principled policy basis to treat lawyers differently from these other learned professionals. *See*

Pl.'s Opp'n 18-19; *see also, e.g.*, *Fearnow*, 138 P.3d at 729 ("We are unable to conclude that the

interests of a lawyer's clients are so superior to those of a doctor's patients (whose choice of a

physician may literally be a life-or-death decision) as to require a unique rule applicable only to

attorneys."); *Babcock*, 863 P.2d at 157 ("[W]e can see no legal justification for treating partners

in law firms differently [in this respect] from partners in other businesses and professions.").[4]

Additionally, as Ipsos argues, it is hard to swallow the proposition that Gessel can evade

an agreement into which he entered voluntarily on the ground that, in doing so, he violated his

*own* ethical obligations. *See* Pl.'s Opp'n 16-17. Notably, it was on that very basis that the only

---

[4]     *See also, e.g.*, Gillers, *Some Problems*, *supra*, at 69 ("Why should lawyers be granted an
immunity from restrictive covenants that is denied other professionals and executives?"); Robert
M. Wilcox, *Enforcing Lawyer Non-Competition Agreements While Maintaining the Profession:
The Role of Conflict of Interest Principles*, 84 MINN. L. REV. 915, 944 (2000) ("[N]o court has
suggested that a client's interest in the selection of legal counsel is any greater than a medical
patient's interest in selecting a physician. The application of a rule of reason to non-competition
agreements among lawyers would bring consistency to the analysis of competition restrictions
involving professionals." (footnote omitted)); Kevin D. Horvitz, Note, *An Unreasonable Ban on
Reasonable Competition: The Legal Profession's Protectionist Stance Against Noncompete
Agreements Binding In-House Counsel*, 65 DUKE L.J. 1007, 1036 (2016) ("[T]he detriment to the
public from being deprived of a lawyer's services is no greater than the detriment that the public
sustains from being deprived of other professionals' services."); Barbara C. Bentrup, Comment,
*Friend or Foe: Reasonable Noncompete Restrictions Can Benefit Corporate In-House Counsel
and Protect Corporate Employers*, 52 ST. LOUIS U. L.J. 1037, 1046 n.63 (2008) (collecting
authorities advocating for the adoption of the reasonableness approach in the context of the legal
profession). *But see Fearnow*, 138 P.3d at 733-34 (Bales, J., concurring in part and dissenting in
part) (noting that "the American Medical Association only discourages," but does not prohibit,
"restrictive covenants between physicians" and that "interests in client choice and lawyer
autonomy . . . are in some respects unique to the legal profession"); *Oak Orchard Cmty. Health
Ctr. v. Blasco*, 800 N.Y.S.2d 277, 281 n.3 (Sup. Ct. 2005).

other court that appears to have considered the enforceability of a non-compete clause between a company and its departing in-house counsel concluded (in granting the employer's motion for preliminary injunctive relief) that the challenged clause was likely enforceable. *See DISH Network Corp. v. Shebar*, No. 2017-CV-31079, 2017 Colo. Dist. LEXIS 87 (Dist. Ct. Colo. May 9, 2017).[5] The *DISH Network* court reasoned that "[t]o the extent the non-competitive provisions in the stock option agreements in [the] case [were] inconsistent with Colo. RPC 5.6(a)," which is substantially identical to New York's Rule 5.6(a), "it was an ethical violation for [the in-house lawyer] — not [his employer] — to participate in the making of those agreements by accepting the non-competitive provisions in order to receive the stock options." 2017 Colo. Dist. LEXIS 87, at *15 (footnote omitted). "[A]n ethical rule," the court continued, "should not serve as license for an attorney to break a promise, go back on his word, or decline to fulfill an obligation, in the name of ethics." *Id.* at *16 (citing *Norton Frickey, P.C. v. James B. Turner, P.C.*, 94 P.3d 1266, 1270 (Colo. App. 2004)).

Notably, *Cohen* and *Denburg* aside, the *DISH Network* court's reasoning finds support in New York law. That is, courts applying New York law, including the New York Court of Appeals, have enforced contracts that were entered into in violation of various Rules of Professional Conduct other than Rule 5.6(a), on the ground that neither lawyers nor their clients should be able to use a lawyer's ethical violation to avoid their contractual obligations. In *Marin v. Constitution Realty, LLC*, 71 N.E.3d 530 (N.Y. 2017), for example, the Court of Appeals

---

[5]     In *Spiegel v. Thomas, Mann & Smith, P.C.*, 811 S.W.2d 528 (Tenn. 1991), the Supreme Court of Tennessee held that a deferred compensation agreement among law firm stockholders that barred withdrawing stockholders from receiving payment if they continued to practice law was unenforceable against a withdrawing stockholder who went on to practice as an in-house lawyer. *Id.* at 528-531. But while the agreement at issue in *Spiegel* was enforced against an in-house lawyer, it was entered into among law firm stockholders and is therefore distinguishable from the Non-Compete Clause between Ipsos and Gessel.

enforced an agreement between lawyers that violated Rule 1.5(g), which requires a lawyer to obtain informed consent from the client to divide a fee for legal services with a lawyer from a different law firm. *Id.* at 533. The court reasoned that, although the failure to inform the client of the fee-sharing agreement was "a serious ethical violation," the attorney who committed the violation could not "avoid on ethical grounds the obligations of an agreement to which [she] freely assented and from which [she] reaped the benefits." *Id.* (internal quotation marks omitted); *see also Benjamin v. Koeppel*, 650 N.E.2d 829, 832-33 (N.Y. 1995) ("[I]t ill becomes defendants, who are also bound by the Code of Professional Responsibility, to seek to avoid on 'ethical' grounds the obligations of [a fee-sharing] agreement to which they freely assented and from which they reaped the benefits.").

Similarly, in *Friedman v. Kuczkir*, 272 F. Supp. 3d 613 (S.D.N.Y. 2017), the district court, applying New York law, awarded damages to an attorney whose former client breached their commission agreement, even though the attorney had violated Disciplinary Rule 5-104 — the precursor to Rule 1.8, governing conflicts of interests with current clients — by failing to observe certain procedural safeguards before entering into the agreement. *Id.* at 632 & n.1, 635. Notwithstanding this ethical violation, the court held, "an agreement between an attorney and a client will be voided only if it is tainted by the lawyer's fraud or undue influence or if it appears that the attorney got the better of the bargain." *Id.* at 632-33 (internal quotation marks omitted). Because the commission agreement in *Friedman* was not tainted by fraud or undue influence, the fee was not excessive, and the client had "ratified" the agreement by "knowingly operating under [it] for six years," the agreement was enforceable. *Id.* at 634. Likewise, Gessel accepted the benefits of his bargain with Ipsos, subject to the Non-Compete Clause, for approximately four years after becoming a member of the bar, during which time he was in violation of Rule 5.6(a).

And unlike the lay client in *Friedman*, Gessel — as a lawyer — knew or should have known that the Non-Compete Clause violated his ethical obligations.  Thus, there is a compelling argument that he should not now be permitted to turn around and invoke that violation to deny Ipsos the benefit of the parties' bargain.

Questions of contract enforceability aside, Rule 5.6(a) has been the subject of considerable criticism on its own terms, particularly as it applies to in-house lawyers.  The stated purpose of the Rule is to preserve not only lawyers' "professional autonomy," but also "the freedom of clients to choose a lawyer."  N.Y. RULES OF PRO. CONDUCT r. 5.6 cmt. 1.  But as commentators have observed, that freedom is already limited under the Rules.  For example, "[a]bsent court order, lawyers may reject clients outright and without a reason," and "every time lawyers accept a case they reduce their availability" to represent other clients who may wish to be represented by them, "if only by virtue of the conflict rules."  Stephen Gillers, *A Rule Without a Reason*, A.B.A. J., Oct. 1993, at 118, 118 (addressing ABA Model Rule 5.6(b) (the New York equivalent of which is Rule 5.6(a)(2)), which governs restrictive covenants in settlement agreements); *see also* Wilcox, *supra*, at 937 ("[U]nder current practice, a lawyer may disappoint a prospective client's wishes by voluntarily declining a matter, but may not voluntarily contract not to represent the client.  If the public policy were truly to ensure the maximum choice of legal counsel for a prospective client, this distinction could not be justified.").  Moreover, Rule 5.6(a) "does not apply to prohibit restrictions that may be included in the terms of the sale of a law practice pursuant to Rule 1.17," N.Y. RULES OF PRO. CONDUCT r. 5.6 cmt. 3, which provides, to the extent relevant here, that "a law firm, one or more members of which are retiring from the private practice of law with the firm[,] . . . may sell a law practice, including goodwill, to one or more lawyers or law firms," and that "[t]he seller and buyer may agree on reasonable restrictions

on the seller's private practice of law," *id.* r. 1.17(a).  Needless to say, a restriction on the private practice of law by the non-retiring members of a law firm in the context of a sale of the firm restricts client choice no less than a non-compete clause within an employment agreement.  *See* Pl.'s Opp'n 20.

Finally, reasoning from first principles, the case for prohibiting non-compete agreements between companies and their in-house lawyers is even weaker than is the case for prohibiting such agreements between law firms and lawyers.  As noted, the modern Rule 5.6(a) traces its origins to a 1961 ABA ethics opinion, which rested on the proposition that "[e]fforts, direct or indirect, in any way to encroach upon the business of another lawyer, are unworthy of those who should be brethren at the Bar."  ABA Formal Op. 300 (internal quotation marks omitted); *see Cohen*, 550 N.E.2d at 411; WILLISTON § 13:7.  For better or for worse, as Chief Justice Rehnquist observed as early as 1987, the private practice of law "has become organized on more and more of a business basis, geared to the maximization of income," with corresponding changes in the ethical mores of the profession, Chief Justice William H. Rehnquist, *Dedicatory Address*, 62 IND. L.J. 151, 154 (1987) — and these changes have only accelerated in the decades since Chief Justice Rehnquist's address.  Indeed, since 1961, other ethical rules premised on the impropriety of competition among lawyers for clients, such as the prohibition on attorney advertising, have been relaxed or even retired.  *See Bates v. State Bar of Ariz.*, 433 U.S. 350, 368, 383 (1977) (holding that attorney advertising is speech protected under the First Amendment and rejecting arguments that "[t]he hustle of the marketplace [would] adversely affect the profession's service orientation" and that "advertising [would] tarnish the dignified public image of the profession").

Even assuming that the reasoning of ABA Formal Opinion 300 still applies with full force to agreements among firm lawyers, a non-compete agreement in an in-house lawyer's employment agreement is more similar to such an agreement in any other commercial employment agreement than to an attempt among lawyers "to barter in clients" in a manner "inconsistent with the best concepts of our professional status."   ABA Formal Op. 300. Additionally, in the in-house context, there is obviously no need to protect the interests of *existing* clients who might wish to follow their current lawyer to a new firm, which was a primary concern of the *Cohen* court, *see* 550 N.E.2d at 411, although considerations surrounding potential *future* clients' choice of counsel, a concern of the *Denburg* court, *see* 624 N.E.2d at 998-99, certainly apply.  Moreover, in-house lawyers frequently perform both legal and non-legal functions, *see, e.g.*, Tonio D. DeSorrento, Note, *Enforceability of Restrictive Covenants: Are In-House Counsel To Be Exempt From Non-Competes?*, 20 GEO. J. LEGAL ETHICS 487, 495 (2007), and "[w]hen an attorney is consulted in a capacity other than as a lawyer, as (for example) a . . . business consultant . . . , that consultation is not privileged," *Pritchard v. County of Erie* (*In re Cnty. of Erie*), 473 F.3d 413, 421 (2d Cir. 2007).  Thus, there is a stronger policy justification for non-compete agreements in the in-house context — namely, to protect the confidences of business clients and communications — than there is in the law firm context, where attorney-client privilege and Rule 1.9 both apply.  *See* Pl.'s Opp'n 20-21; Horvitz, *supra*, at 1041-1044 (arguing that "an attorney's preexisting ethical obligations under Rule 1.9" do not "adequately protect corporate employers"); *cf. Cohen*, 550 N.E.2d at 411 (noting that a departing law firm attorney "would be bound" under ethical rules "to preserve the confidences and not divulge the secrets, of any clients of his former employer," and that "no restrictive covenant in an employment contract is needed to enforce these provisions" (quoting ABA Formal Op. 300)).

In the Court's view, however, *Cohen* and *Denburg* leave no room to accept any of these arguments. To be sure, the cases did not involve in-house counsel and, in that limited sense, do not directly control the outcome here. But they do stand for the proposition that an agreement that runs afoul of Rule 5.6(a) is *per se* unenforceable under New York law and, as discussed above, the Non-Compete Clause in Gessel's agreement plainly violates that Rule. Moreover, the policy of encouraging client choice, which the New York Court of Appeals identified in *Cohen* and *Denburg* as the purpose of Rule 5.6(a), applies not only in the law firm context, but also in the in-house context. Here, for example, the Non-Compete Clause in Gessel's contract purports to prohibit him from representing Medallia, which has chosen him as its preferred in-house lawyer. Even assuming that the intent of Ipsos's Non-Compete Clause was solely to protect the company's legitimate interests in maintaining confidential client information, *see* Fair Competition Agreement § 5(a) ("You acknowledge that the Company is engaged in a highly competitive industry and that the preservation of its Client Confidences and Confidential Information is critical to the Company's continued business success."), all that matters under *Denburg* is that its *effect* is to restrict Gessel's ability to practice law on behalf of an Ipsos competitor, *see* 624 N.E.2d at 999.

To the extent that Ipsos even acknowledges *Cohen* and *Denburg*, its attempts to distinguish the decisions are unpersuasive. Its principal argument, for example, is that Rule 5.6(a) does not apply to Ipsos, as a non-lawyer. *See* Pl.'s Opp'n 15-18. But nothing in *Cohen* or *Denburg* suggests that this distinction is material. Moreover, the lawyers who drafted the employment agreement and offered it to Gessel on Ipsos's behalf, whether in-house or otherwise, plainly violated the Rule, which prohibits "participat[ion] in *offering* or making" an "agreement that restricts the right of *a* lawyer to practice after termination of the relationship." N.Y. RULES

OF PRO. CONDUCT r. 5.6(a) (emphases added).  And finally, as long as Rule 5.6(a) remains binding on New York in-house lawyers, there is at least one compelling policy justification for refusing to enforce agreements that violate it: If such agreements could be enforced, companies would have an incentive to insist that their in-house lawyers sign commercially valuable non-compete clauses as a condition of employment (notwithstanding the resulting ethical violations of any lawyers who participated in drafting such agreements, as well as the in-house lawyers who signed them).  This would place in-house counsel in the untenable position of choosing between violating their ethical obligations or forgoing employment.  As long as non-compete clauses remain unenforceable against in-house counsel, companies will have little incentive to include them in their employment agreements.

In short, the Court concludes that it is compelled by the New York Court of Appeals's decisions in *Cohen* and *Denburg* to accept Gessel's argument that the Non-Compete Clause is *per se* unenforceable against him.  Given the sound criticisms of Rule 5.6(a) and the categorical approach to non-compete provisions involving lawyers, a strong case could certainly be made for reconsideration of *Cohen* and *Denburg* (if not Rule 5.6(a) itself).  But such reconsideration would have to come from the Court of Appeals; this Court, of course, is bound by the decisions of that court.  In light of the arguments for distinguishing non-compete agreements between companies and in-house counsel from non-compete agreements between law firms and their members, a strong case could perhaps also be made for limiting *Cohen* and *Denburg* to their facts and not extending their holdings to agreements with in-house counsel.  But, as noted above, where New York law is unsettled, this Court's obligation is to predict what the New York Court of Appeals would decide.  And while *Cohen* and *Denburg* are not on all fours with this case, the

Court concludes that their holdings compel the conclusion that the Non-Compete Clause is categorically unenforceable. It is for the Court of Appeals, not this Court, to declare otherwise.[6]

That does not fully resolve Gessel's motion to dismiss, however, because Ipsos alleges that Gessel not only violated the Fair Competition Agreement by accepting employment with Medallia, but also "by failing to give Ipsos two weeks' advance written notice of his intention to work for Medallia, a competitor of Ipsos" and "by deleting the contents of the cellphone Ipsos provided to him prior to returning it to Ipsos." Compl. ¶¶ 44, 46.[7] It is not clear, however, whether Ipsos continues to press these theories of breach, as — passing and conclusory references to them in the *fact* section of its memorandum of law aside, *see* Pl.'s Mem. 6-7, 10-11 — it does not invoke them in response to Gessel's motion, which seeks on its face to dismiss the Complaint in its entirety. *See* ECF No. 10; *see also, e.g.*, *Leath v. County of Orange*, No. 18-CV-7318 (NSR), 2020 WL 4016530, at *6 (S.D.N.Y. July 15, 2020) ("It is well-settled that the failure to oppose an argument raised in a motion to dismiss is deemed a concession of the argument and abandonment of the claims." (collecting cases)). At the same time, Gessel does not explicitly reference these theories of breach in his memorandum of law. Under these circumstances (and because this ruling may facilitate a settlement of all claims in the case), the

---

[6] If it had authority to do so, the Court would be tempted to certify the question presented in this case to the New York Court of Appeals. Alas, the Court lacks that authority. Under New York law, only the Second Circuit has the authority to certify questions to the New York Court of Appeals. *See* N.Y. Comp. Codes R. & Regs. tit. 22, § 500.27(a); 2d Cir. R. 27.2(a); *see also Indus. Risk Insurers v. Port Auth. of N.Y. & N.J.*, 493 F.3d 283, 285 n.1 (2d Cir. 2007).

[7] In its memorandum of law, Ipsos also contends that Gessel breached Section 6 of the Fair Competition Agreement by "solicit[ing] or provid[ing] services to Ipsos' actual or prospective clients." Pl.'s Opp'n 6-7, 10-11. But Ipsos nowhere alleges in the Complaint that Gessel was subject to an anti-solicitation provision, let alone that he violated it. "[I]t is well-settled that a claim for relief may not be amended by the briefs in opposition to a motion to dismiss." *Willard v. UP Fintech Holding Ltd.*, — F. Supp. 3d — , No. 19-CV-10326 (JMF), 2021 WL 1026571, at *6 n.6 (S.D.N.Y. Mar. 17, 2021) (internal quotation marks omitted).

Court refrains from addressing these independent theories of breach absent confirmation from Ipsos that it actually intends to pursue them.

**CONCLUSION**

For the foregoing reasons, Gessel's motion to dismiss is GRANTED with respect to Ipsos's claim that he breached the Non-Compete Clause. Moreover, the Court declines to grant Ipsos leave to amend the claim. Although leave to amend a complaint should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), it is "within the sound discretion of the district court to grant or deny leave to amend," *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 447 (2d Cir. 2019) (internal quotation marks omitted). Here, the problems with Ipsos's claim are substantive, so amendment would be futile. *See, e.g.*, *Roundtree v. NYC*, No. 19-CV-2475 (JMF), 2021 WL 1667193, at *6 (S.D.N.Y. Apr. 28, 2021) (citing cases). Although Ipsos requests leave to amend "to assert additional facts concerning the non-legal nature of much of what Gessel did for Ipsos," Pl.'s Opp'n 20 n.2, those facts would not change the conclusion that the Non-Compete Clause violates Rule 5.6(a) and, thus, is categorically unenforceable under existing New York law.

The Court refrains from ruling on Ipsos's allegations that Gessel breached the Fair Competition Agreement "by failing to give Ipsos two weeks' advance written notice of his intention to work for Medallia, a competitor of Ipsos" and "by deleting the contents of the cellphone Ipsos provided to him prior to returning it to Ipsos." Compl. ¶¶ 44, 46. No later than **July 16, 2021**, Ipsos shall file a letter indicating whether (in light of this ruling or otherwise) it intends to pursue these theories of breach. To the extent that it does intend to do so, the letter should also address whether the two theories should be deemed abandoned and whether, in light of the Court's ruling with respect to the Non-Compete Clause, the two-week-notice provision is

also categorically unenforceable.  If Ipsos indicates in its letter that it does not intend to press either theory, the Court will close the case without further notice.  If Ipsos indicates in its letter that it intends to press either theory, Gessel may file a letter in response no later than **July 23, 2021**.  (Pending the Court's ruling on whether either or both of these theories will proceed, Gessel need not file an answer.)  No reply may be filed absent leave of Court.  Finally, in light of this ruling, the pretrial conference previously scheduled for July 6, 2021, to discuss an expedited discovery schedule, *see* ECF No. 32, is CANCELED as unnecessary.

The Clerk of Court is directed to terminate ECF No. 10.


SO ORDERED.

Dated: July 2, 2021
      New York, New York

JESSE M. FURMAN
United States District Judge